# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

GEORGE DERNIS and MARIA DERNIS,     )
                                        )
         Plaintiffs,            )
                                        )      No. 21 CV 3157
         v.                 )
                                        )      Judge Marvin E. Aspen
UNITED STATES OF AMERICA,       )
                                        )
         Defendant.         )

## MEMORANDUM OPINION AND ORDER

MARVIN E. ASPEN, District Judge:

Plaintiffs George and Maria Dernis have sued the United States of America under the Federal Tort Claims Act ("FTCA"), alleging that the Federal Deposit Insurance Corporation ("FDIC") committed various common-law torts. (*See generally* 2d Am. Compl. and Jury Demand ("2d Am. Compl.") (Dkt. No. 70).) The United States now moves to dismiss the Second Amended Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (Def.'s Mot. Dismiss (Dkt. No. 76); Def.'s Mem. Supp. Mot. Dismiss (Dkt. No. 77).) For the following reasons, we grant the motion and dismiss the Second Amended Complaint with prejudice.

## FACTUAL BACKGROUND

We take the following facts from the Second Amended Complaint, "documents attached to the [Second Amended Complaint], documents that are critical to the [Second Amended Complaint] and referred to in it, [] information that is subject to proper judicial notice[,]" and additional facts set forth in the Dernises' response, "so long as those facts are consistent with the pleadings." *See Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019–20 (7th Cir. 2013)

(internal punctuation and citation omitted). We have accepted as true all well-pleaded factual allegations and drawn all reasonable inferences in the Dernises' favor. *See O'Brien v. Vill. of Lincolnshire*, 955 F.3d 616, 621 (7th Cir. 2020).

## A. The Dernises and Their Involvement with Premier Bank

George Dernis ("Dernis") is a businessman who used to own a chain of produce and grocery stores in the Chicagoland area. (2d Am. Compl. ¶¶ 43, 47.) Maria Dernis is his wife. (*See generally id.*) In 2004, Dernis began working with Premier Bank ("Premier"), a now-defunct financial institution based in Wilmette, Illinois, to finance the expansion of his business operations. (*Id.* ¶¶ 5, 48–50.) Over the next two years, Dernis gradually transferred his business (including loans he held at other banks) to Premier, such that by the end of 2006, Dernis was relying on Premier for all of his banking and financing needs, both business and personal. (*Id.* ¶ 53.)

By 2011, Dernis had taken out several loans from Premier totaling millions of dollars. (*E.g., id.* ¶¶ 48–50, 72, 76, 88–89, 120.) For purposes of this motion, we discuss just two of the loans in detail. In September 2004, Dernis obtained a $3.535 million loan to acquire an additional grocery store and shopping center. (*Id.* ¶¶ 48–50.) This loan was secured by a mortgage on Dernis's personal residence at 741 Center Street in Douglas, Michigan (the "Center Street Property"). (*Id.* ¶¶ 49–50.) The original borrower on the loan was Cermak Produce No. 3 Inc. (*Id.* ¶ 128.) The mortgage was modified in September 2006 to substitute a later-dated promissory note for the original note and to change the borrower from Cermak Produce No. 3 Inc. to Dernis. (*Id.* ¶ 129.) The second loan, obtained in September 2008, was a $2.9 million loan to purchase property at 19-23 Water Street in Douglas, Michigan (the "Water Street Property"). (*Id.* ¶¶ 81, 87–88.) This loan was secured by a mortgage on the Water Street Property. (*Id.* ¶ 88.) Following subsequent modifications to the note for this loan, both the Center Street Property and the Water

Street Property (collectively, the "Michigan Properties") served as collateral for all of Dernis's loans with Premier. (*Id.* ¶¶ 132–34, 137–39.)

## B. The Dernises' Dispute with Premier, Premier's Entry into Receivership, and the Dernises' Financial Troubles

The Dernises' relationship with Premier soured over time. The Dernises allege that as of September 2010, the FDIC knew that Premier had been involved in "unsafe or unsound" banking practices and had violated laws, rules, and regulations, as evidenced by a consent order in an FDIC proceeding. (*Id.* ¶¶ 176–178.) More broadly, the Dernises allege that from 2006 to 2011, Premier and its owners, Dr. Zulfikar Esmail and Shamim Esmail, perpetuated a multi-step fraudulent scheme by which they "extracted" between $2.5 and $3 million from Dernis. (*Id.* ¶¶ 20, 56–124, 140–43.) By early 2011, the actions of Premier and the Esmails had deprived Dernis of almost all his assets and his companies of almost all their value. (*Id.* ¶¶ 121, 143.) Premier and Dr. Esmail then cut off the banking and financial services that Dernis had relied upon. (*Id.* ¶ 122.) The Dernises eventually challenged the validity of the two mortgages on the Michigan Properties due to Premier's fraudulent conduct. The Dernises allege that Premier's representatives forged the signatures authorizing the September 2006 modification of the mortgage on the Center Street Property, thereby rendering the mortgage void. (*Id.* ¶¶ 129, 131, 203–05.) They also allege that the mortgage on the Water Street Property is void because it "was signed under false pretenses and pursuant to fraudulent and criminal actions by the owners, officers, and/or directors of Premier." (*Id.* ¶ 136.)

In 2011, Dernis and his representatives informed several individuals about Premier's fraudulent scheme and violation of federal banking regulations. These individuals included David Arts, a liaison between Premier's board of directors and the FDIC, and Anthony Abrams, an

attorney for Premier who later represented the FDIC in litigation. (*Id.* ¶¶ 37, 40, 144–49, 166, 181.) In 2011, Dernis also contacted the FDIC's Office of Inspector General "regarding the improper and criminal actions of Premier and its officers and directors." (*Id.* ¶ 224.) At some point, Dernis gave federal criminal investigators and the FDIC photographs of Dr. Esmail removing files and computers from Premier's offices. (*Id.* ¶ 153.)

Later in 2011, Dernis attempted to develop a payment plan for his loans from Premier. (*Id.* ¶¶ 144–46, 148–51.) Ultimately, Premier and the FDIC were unwilling to proceed with the plan, and Dernis's companies filed for Chapter 11 bankruptcy at the end of 2011. (*Id.* ¶¶ 151–52.)

In January 2012, Premier filed two lawsuits in Illinois state court to collect on the loans to Dernis. (*Id.* ¶¶ 24, 123, 154–55.) The following month, Premier instituted nonjudicial foreclosures on the Michigan Properties. (*Id.* ¶¶ 26, 124.) In mid-March, the Dernises responded by filing lawsuits against Premier, the Esmails, and others in Illinois and Michigan state courts. (*Id.* ¶¶ 156–57, 189.). In the Michigan lawsuit, which was later removed to federal court, the Dernises sought an injunction to stop the pending foreclosures. (*Id.* ¶¶ 157, 189.)

On March 23, 2012, the Illinois Department of Financial and Professional Regulation closed Premier and appointed the FDIC as the bank's Receiver. (*Id.* ¶ 180.) As Receiver, the FDIC succeeded by operation of law to all of Premier's "rights, titles, powers, and privileges." 12 U.S.C. § 1821(d)(2)(A). The FDIC took possession of Premier's assets and obtained the ability to "collect all obligations and money due" to the bank and "preserve and conserve" the bank's "assets and property." *Id.* § 1821(d)(2)(B). Once appointed as Receiver, the FDIC substituted for Premier as a party in the pending lawsuits. (2d Am. Compl. ¶¶ 157, 159, 191–92.) The FDIC continued the collection actions brought by Premier against the Dernises. (*Id.* ¶¶ 32, 36.) The FDIC also continued the nonjudicial foreclosure proceedings that Premier had initiated. (*Id.*)

4

In spring and summer 2012, the Dernises made another attempt to resolve their outstanding obligations regarding the Premier loans. A consultant for Dernis tried to develop a workout plan for the loans with a contractor for the FDIC who was aware of pending criminal investigations of Premier and the Esmails. (*Id.* ¶¶ 162–163.) The FDIC would not approve the plan that the consultant and contractor had negotiated, nor would it make a counterproposal. (*Id.* ¶ 163.) In June 2013, Dernis filed for Chapter 7 bankruptcy, and the FDIC later filed an adversary complaint objecting to a discharge. (*Id.* ¶ 181.) The Dernises' companies were eventually liquidated; they attribute that outcome to the fact that in the previous Chapter 11 bankruptcy, the FDIC did not participate in negotiations to restructure those entities. (*Id.* ¶ 184).)

Around the same time, in June 2013, state-court criminal indictments for bank fraud were filed against the Esmails and other individuals affiliated with Premier.[1] (*Id.* ¶¶ 187, 193.) In a filing in one of the Dernises' ongoing foreclosure proceedings, the FDIC acknowledged that it was aware of the state-court indictments as of July 30, 2013. (*Id.* ¶ 193.) After January 2014, the FDIC did not exercise any further rights to foreclose on the Michigan Properties "because [it] knew the mortgage documents were forged and Premier [had] engaged in fraud." (*Id.* ¶¶ 194–95.)

## C.    The Amos Financial Agreement and Related Foreclosure Litigation

In November 2014, the FDIC Receiver sold a group of Premier's loans, including those relating to the Michigan Properties, to Amos Financial LLC ("Amos Financial"), a debt-acquisition firm, as part of a "loan pool" transaction. (*Id.* ¶ 196; 2d Am. Compl., Ex. 4 ("Loan Sale Agreement") (Dkt. No. 70-4) at 2, 6.) Pursuant to the Loan Sale Agreement, Amos Financial

---

[1]    In November 2015, Dr. Esmail pleaded guilty to two felony counts. He was sentenced to five' years incarceration. (2d Am. Compl. ¶ 201.)

paid $2,100,000.00 for the loan package, of which the Dernises' loans constituted 84 percent.  (2d Am. Compl. ¶ 196–97.)  The FDIC also assigned the mortgages for the Michigan Properties to Amos Financial.  (*Id.* ¶ 169.)  As a result of this transaction, Amos Financial acquired the FDIC's interests in the pending foreclosure litigation.  (*Id.* ¶ 39).  The Dernises allege that the assignment did not comply with Michigan law and was invalid.  (*Id.* ¶¶ 170–73.)

In February 2015, Amos Financial pursued foreclosure on the Michigan Properties.  (*Id.* ¶ 198); *Dernis v. Amos Financial, LLC* (*Amos*), Nos. 350862, 352014, & 350902, 2021 WL 297278, at *2 (Mich. Ct. App. Jan. 28, 2021), *leave to appeal denied*, 966 N.W.2d 360 (Mich. 2021).[2]  The Dernises fault the FDIC for "[doing] nothing to stop" this proceeding.  (2d Am. Compl. ¶ 41.)  The following month, the Dernises filed a lawsuit in Michigan state court (the "2015 Michigan Lawsuit").  (*Id.* ¶ 199.)  In the 2015 Michigan Lawsuit, the Dernises sought to prevent Amos Financial from foreclosing on the Michigan Properties.  *Amos*, 2021 WL 297278, at *1.  The Dernises later added the FDIC Receiver as a codefendant, alleging that the Receiver's transfer of the loans to Amos Financial constituted fraud, conversion, conspiracy, and violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO").  *Id.* at *2 nn.3, 11 (citing, *inter alia*, *Dernis v. Amos Fin., LLC*, No. 16 C 64 (W.D. Mich.)).  The Receiver removed the case to federal court, and the claims against the Receiver were dismissed for lack of subject-matter jurisdiction due to the Dernises' failure to exhaust administrative remedies.  *See Dernis v. Amos*

---

[2]     Plaintiffs allege in the Second Amended Complaint that Amos Financial filed a notice of foreclosure in February 2014, not February 2015, (*id.* ¶ 198), but the reference to 2014 appears to be a typographical error.  According to plaintiffs' own timeline, Amos Financial was not assigned the mortgages until late 2014.  Moreover, the Michigan Court of Appeals stated in the cited *Dernis* decision that Amos Financial pursued foreclosure in February 2015.

*Fin.*, 701 F. App'x 449, 451 (6th Cir. 2017). In 2017, the Sixth Circuit affirmed the dismissal. *See id.* The remainder of the case was remanded to Michigan state court.

In April 2017, the Dernises' then-attorney, Allen Shapiro, asked the FDIC to advise Amos Financial that the mortgages and related documents should be "returned" to the FDIC so that the FDIC could enter into a global settlement with the Dernises. (2d Am. Compl. ¶¶ 211–12.) The FDIC did not respond to the request. (*Id.* ¶ 212.)

In 2018, the Allegan County Treasurer issued a delinquent tax notice for the Michigan Properties. (*Id.* ¶ 214.) Sometime in 2015, Amos Financial had obtained title to the Michigan Properties through a sheriff's sale, and it subsequently failed to pay the required property taxes. *See Amos*, 2021 WL 297278, at *3; *Dernis v. FDIC* (*Dernis*), No. 1:20-cv-00535-RJJ-RSK (W.D. Mich.), Dkt. No. 1-1 at 28–30; (2d Am. Compl. ¶¶ 213–15). The Dernises borrowed money and paid the property taxes by the April 1, 2019 redemption deadline. (2d Am. Compl. ¶¶ 214, 217–19.) Title to the Michigan Properties, however, remained with Amos Financial. (*Id.* ¶ 216.) The following month, the trial court in the 2015 Michigan Lawsuit entered default judgment against Amos Financial invalidating the FDIC Receiver's assignments of the Michigan Properties to Amos Financial because they were signed by an agent who did not have personal knowledge of the underlying facts that would support his signature. *See Amos*, 2021 WL 297278, at *1–3; *Dernis*, Dkt. No. 1-1 at 34–36 (Center Street Property); *Dernis v. Amos Fin., LLC*, No. 15-54718-CZ, 2019 WL 11902162, at *1 (Mich. Cir. Ct. Sept. 12, 2019). The trial court's order voided Amos Financial's interest in the Michigan Properties and transferred interest back to the Dernises, *see Amos*, 2021 WL 297278, at *1, giving rise to what the Dernises refer as the FDIC's assertion of a "reversionary interest" in the Michigan Properties. (2d Am. Compl. ¶¶ 221–23.)

7

D.      **The Dernises' Litigation Against the FDIC**

In March 2020, after the FDIC declined to relinquish an interest in the Michigan Properties, the Dernises filed an action in Michigan state court against the FDIC and others, seeking to quiet title to the Center Street Property.  (*Id.* ¶ 220); *Dernis*, Dkt. No. 1-1 at 2–6, 17–18.  According to the Dernises, the FDIC "[s]trangely" continued to assert a "reversionary interest" in the Michigan Properties.  (2d Am. Compl. ¶¶ 220–21; Pls.' Resp. Obj. Def.'s Mot. Dismiss ("Pls.' Resp.") (Dkt. No. 84) at 15 ("[A]fter Plaintiffs filed a lawsuit to quiet title, the FDIC resurfaced and alleged that it has a reversionary interest in the property that it already sold.").)  After the FDIC removed the quiet-title suit to federal court, the district court dismissed the case against the FDIC for lack of jurisdiction based on the Dernises' failure to exhaust administrative remedies, and it remanded the remainder of the case to state court.  (2d Am. Compl. ¶ 220); *Dernis*, Dkt. Nos. 4, 10.

On January 5, 2021, Shapiro sent a letter to the FDIC on behalf of the Dernises.  (2d Am. Compl., Ex. 1 ("January 2021 Letter") (Dkt. No. 70-1).)  Shapiro stated that the purpose of the letter was to "ask [the FDIC] to look into [George Dernis's] case, and perhaps, help us negotiate a 'global settlement' to remedy what we believe is unfair treatment" of Dernis by the FDIC Receiver.  (*Id.* at 2.)  He further stated that the "precipitating event" for the January 2021 Letter was the Receiver's assertion of a "reversionary interest" in the Michigan Properties, about which the Dernises were "puzzled" and requested "review."  (*Id.*)  Shapiro also complained of several actions that the FDIC had taken over the previous decade, including its sale to Amos Financial of "the then known 'fraudulent loans' involving the Michigan Properties."  (*Id.* at 3.)  He claimed that the Dernises had suffered "millions of dollars" in damages as a result of the actions of Premier and the Receiver and that the Dernises' commercial properties had had a value in 2011 of somewhere between \$15 and \$20 million.  (*Id.* at 3–4.)  The letter was accompanied by a 25-page unsworn

document titled "Chronology" describing events dating back to 2004. (*Id.* at 5–29.) The Dernises assert that they exhausted all required administrative remedies by sending the January 2021 Letter. (2d Am. Compl. ¶ 7.)

A few weeks after Shapiro sent the January 2021 Letter, the Michigan Court of Appeals vacated the trial court's orders in the 2015 Michigan Lawsuit in which the trial court had returned the Michigan Properties to the Dernises. *Amos*, 2021 WL 297278, at *1, 14. The Court of Appeals concluded that the trial court lacked jurisdiction over the majority of the Dernises' claims and had abused its discretion by denying Amos Financial's motion to set aside its default. *Id.* It further concluded that the Dernises' claims involving the validity of the FDIC Receiver's assignments to Amos Financial were barred by federal law and that the Dernises lacked standing to challenge the assignments. *Id.* at *7 & n.10. The case was remanded for a determination of Amos Financial's liability on the merits of the "limited claims" within the trial court's jurisdiction, namely, those relating to Amos Financial's compliance with the governing law on foreclosure by advertisement. *Id.* at *14.

The FDIC treated the January 2021 Letter as a "general unsecured claim against" the receivership that arose from the Receiver's "assertion in 2020 of a reversionary interest in certain real estate owned by" the Dernises. (2d Am. Compl., Exs. 2–3 (Dkt. Nos. 70-2, 70-3).) In April 2021, the FDIC disallowed the Dernises' claim for two reasons: (1) it was "submitted after the specified Submission Deadline of June 25, 2020"; and (2) it was "not proven to the satisfaction of the Receiver." (*Id.*; (2d Am. Compl. ¶ 8).) This suit followed.

## PROCEDURAL BACKGROUND

On June 11, 2021, the Dernises filed the instant action against the FDIC in its corporate capacity ("Corporate") and in its capacity as Premier's Receiver.[3]  (Verified Compl. and Jury Demand (Dkt. No. 1).)  Both FDIC defendants moved to dismiss.  (Dkt. Nos. 20, 28.)  In response, the Dernises amended their complaint.  (Am. Compl. (Dkt. No. 37).)  In the amended complaint, the Dernises alleged claims against the FDIC defendants for violations of  RICO, conspiracy to violate RICO, conversion, invasion of privacy and intrusion upon seclusion, intentional and negligent infliction of emotional distress, and conspiracy.  (*Id.* ¶¶ 270–329 (Counts 1–7).)

The FDIC defendants again moved to dismiss.  (Dkt. Nos. 42, 43.)  We granted those motions.  (Memorandum Opinion and Order of September 30, 2022 ("Sept. 2022 Op.") (Dkt. No. 68).)  We dismissed the RICO claims against the Receiver without prejudice based on the Dernises' failure to exhaust administrative remedies and the RICO claims against Corporate with prejudice based on the Dernises' failure to state a claim.  (*Id.* at 9–13.)  We also dismissed the Dernises' common-law tort claims without prejudice for lack of jurisdiction because the Dernises had failed to sue the correct party, the United States, on those claims.  (*Id.* at 8–9.)  We gave the Dernises another opportunity to amend their complaint.  (*Id.* at 14.)

Thereafter, the Dernises filed the Second Amended Complaint asserting several tort claims against the United States due to the FDIC's conduct.  They claim that despite the FDIC defendants' knowledge of Premier's regulatory violations, the criminal investigations and charges against Premier and its officers, and the Dernises' own allegations that Premier and the Esmails had defrauded them and falsified documents with respect to their loans, the FDIC defendants

---

[3]     Corporate and Receiver are legally distinct entities.

improperly (1) continued to pursue foreclosure on the Michigan Properties and collect on the associated loans; (2) sold the loans to Amos Financial; and (3) failed to enforce the Loan Sale Agreement and exercise its legal rights, which allowed Amos Financial to profit from the fraudulent loans. (2d Am. Compl. ¶¶ 20–31, 159, 161, 164, 179, 185–86, 196–97, 221–31, 243, 249, 252.) The Dernises also claim that the FDIC defendants improperly claimed a reversionary interest on the collateral, the Michigan Properties. (*Id.* ¶ 221.)

The United States now moves to dismiss the Second Amended Complaint for lack of subject-matter jurisdiction under Rule 12(b)(1) and failure to exhaust administrative remedies and failure to state a claim under Rule 12(b)(6).

## LEGAL STANDARDS

The standard for evaluating a Rule 12(b)(1) motion to dismiss, which challenges our subject-matter jurisdiction, depends on whether the defendant raises a facial or factual challenge. Fed. R. Civ. P. 12(b)(1); *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015). If, as here, a defendant challenges the sufficiency of the allegations regarding subject-matter jurisdiction, the defendant raises a facial challenge. *Silha*, 807 F.3d at 173. When evaluating a facial challenge to subject-matter jurisdiction, we employ "the same standard used to evaluate facial challenges to claims under Rule 12(b)(6)." *Id.* at 173–74.

A Rule 12(b)(6) motion to dismiss tests the sufficiency of a complaint. *Gociman v. Loyola Univ. of Chi.*, 41 F.4th 873, 885 (7th Cir. 2022). When considering such motions, we construe the complaint in the light most favorable to the plaintiff, accept as true all well-pleaded facts, and draw all reasonable inferences in the plaintiff's favor. *Lax v. Mayorkas*, 20 F.4th 1178, 1181 (7th Cir. 2021). To withstand a Rule 12(b)(6) motion, the complaint must assert a facially plausible claim and provide the defendant fair notice of the claim's basis. *Ashcroft v. Iqbal*, 556 U.S. 662, 678

11

(2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

As a preliminary matter, we address the Dernises' contention that we must treat the United States's Rule 12(b)(6) motion as a motion for summary judgment under Rule 56. (Pls.' Resp. at 1–2, 9–10.) According to the Dernises, we must do so because the United States "has made arguments outside the scope of the pleadings and has referenced many documents from other court cases." (*Id.* at 1.) This contention is unpersuasive. For one thing, it is undeveloped; the Dernises make no attempt to identify the arguments or documents that purportedly require us to treat the United States' motion as one for summary judgment. (*See id.*) What is more, although Rule 12(d) generally requires a court to treat a Rule 12(b)(6) motion as a Rule 56 motion when it considers "matters outside the pleadings," Fed. R. Civ. P. 12(d), a court need not do so when it properly takes judicial notice. *Ennenga v. Starns*, 677 F.3d 766, 773–74 (7th Cir. 2012); *520 S. Mich. Ave. Assocs. v. Shannon*, 549 F.3d 1119, 1137 n.14 (7th Cir. 2008); *Lecat's Ventriloscope v. MT Tool & Mfg.*, No. 16 C 5298, 2018 WL 3651592, at *3 (N.D. Ill. Aug. 1, 2018) (taking judicial notice of documents in the public record does not trigger Rule 12(d)). "[D]ocuments from other court cases," (Pls.' Resp. at 6), are proper subjects of judicial notice. *Fosnight v. Jones*, 41 F.4th 916, 922 (7th Cir. 2022) ("We've long held that district courts can take judicial notice of public court documents and proceedings when considering a Rule 12(b)(6) motion."); *J.B. v. Woodard*, 997 F.3d 714, 717 (7th Cir. 2021); *Kane v. Bank of Am., N.A.*, 338 F. Supp. 3d 866, 869 (N.D. Ill. 2018) ("Among the matters subject to proper judicial notice are state court filings and judicial decisions."). In any event, the documents from the Dernises' previous litigation are useful for background but ultimately are not central to our disposition of the United States' motion. We

consider the motion under the standard applicable to a Rule 12(b)(6) motion to dismiss.

## ANALYSIS

The Dernises bring claims against the United States under the Federal Tort Claims Act ("FTCA") for conversion; invasion of privacy and intrusion upon seclusion; intentional infliction of emotional distress; negligence and negligent infliction of emotional distress; and conspiracy. (2d Am. Compl. ¶¶ 1, 15, 270–311.) The FTCA waives the United States' sovereign immunity "for certain torts committed by federal employees." *FDIC v. Meyer*, 510 U.S. 471, 475 (1994). It "makes the United States liable to the same extent as a private individual under like circumstances, under the law of the place where the tort occurred, subject to enumerated exceptions to the immunity waiver." *Levin v. United States*, 568 U.S. 503, 506–07 (2013) (internal punctuation and citations omitted). "In FTCA cases, state law applies to substantive questions and federal rules govern procedural matters." *Gil v. Reed*, 535 F.3d 551, 558 n.2 (7th Cir. 2008).

The United States moves to dismiss the Dernises' claims on several grounds. It contends that (1) the Dernises have failed to exhaust their administrative remedies for almost all of the alleged actions or omissions underlying these claims, and the only aspect of the case supported by properly exhausted conduct is moot; (2) the United States is immune from liability under Illinois's Local Governmental and Governmental Employees Tort Immunity Act (the "Tort Immunity Act"), 745 ILCS 10/1-101 *et seq.*; (3) the Dernises' claims are barred under 28 U.S.C. § 2680(h); and (4) the Dernises otherwise fail to state a claim for relief under Rule 12(b)(6). (Def.'s Mem. Supp. Mot. Dismiss at 6–13.)[4]

---

[4]     The Dernises oppose defendant's motion and request oral argument. We deny the request because the parties' briefs adequately inform us of the issues and oral argument would not be of significant aid. *See* N.D. Ill. LR 78.3 (oral argument is subject to the court's discretion).

In its first three arguments, the United States relies on principles that are regarded as affirmative defenses. *See Chaba v. USPS*, No. 20 C 4517, 2021 WL 1293830, at *5 (N.D. Ill. Apr. 7, 2021) (FTCA's exhaustion requirement); *Tyson v. Cook Cnty.*, 539 F. Supp. 3d 924, 928 (N.D. Ill. 2021) (immunity under the Tort Immunity Act); *Bunch v. United States*, 880 F.3d 938, 942 (7th Cir. 2018) (exceptions to FTCA's waiver of sovereign immunity). A plaintiff need not plead around affirmative defenses, but dismissal on the basis of an affirmative defense is appropriate when the complaint sets forth everything necessary to satisfy the defense. *Chi. Bldg. Design, P.C. v. Mongolian House, Inc.*, 770 F.3d 610, 614 (7th Cir. 2014).

## A.    Exhaustion and Mootness

The United States first argues that the Second Amended Complaint should be dismissed due to the Dernises' failure to exhaust their administrative remedies with respect to all claims other than those related to the FDIC's assertion of a reversionary interest in the Michigan Properties— a dispute that it claims is moot in light of the Michigan Court of Appeals' 2021 ruling and the FDIC's subsequent abandonment of its reversionary interest. We take up the issues of exhaustion and mootness in turn.

### 1.    Exhaustion

The FTCA "requires exhaustion of administrative remedies as a prerequisite to suit." *Glade ex rel. Lundskow v. United States*, 692 F.3d 718, 723 (7th Cir. 2012). The purpose of the exhaustion requirement is to give the appropriate federal agency "an opportunity to meaningfully consider and address [a plaintiff's] claim prior to suit." *Chronis v. United States*, 932 F.3d 544, 546 (7th Cir. 2019) (citations omitted). A plaintiff cannot bring a lawsuit under the FTCA unless he has first "presented the claim to the appropriate Federal agency" and the claim has been finally denied by the agency in writing. 28 U.S.C. § 2675(a). Moreover, the claim must be presented "in

writing to the appropriate Federal agency within two years after such claim accrues." *Id.* § 2401(b). Otherwise, it is "forever barred." *Id.*; *see also Khan v. United States*, 808 F.3d 1169, 1172 (7th Cir. 2015) (affirming dismissal of FTCA lawsuit as untimely because plaintiff failed to present her administrative claim to the federal agency within two years of its accrual). The exhaustion requirement is a claims-processing rule that is not jurisdictional. *Glade*, 692 F.3d at 723.

We can fully address exhaustion at this juncture; the Second Amended Complaint alleges all pertinent facts, and Dernises rely on the January 2021 Letter to the FDIC as evidence of exhaustion and attach it as an exhibit to their complaint. *See Gray v. United States*, 723 F.3d 795, 799 n.1 (7th Cir. 2013); *Chaba v. USPS*, No. 20 C 4517, 2021 WL 1293830, at *5 (N.D. Ill. Apr. 7, 2021) ("[I]t is altogether routine for courts to dismiss on Rule 12(b)(6) grounds for failure to exhaust, both in FTCA cases and in other contexts in which administrative exhaustion is a prerequisite to suit.").

The United States concedes that the January 2021 Letter, in which the Dernises "primarily complained about the FDIC Receiver's recent assertion of a reversionary interest" in the Michigan Properties, timely exhausted any claims "relating to the reversionary interest." (Def.'s Mem. Supp. Mot. Dismiss at 6.) But it argues that the January 2021 Letter did not present any *other* complaints about the FDIC in a timely manner (i.e., within two years of their accrual), so we should not consider allegations other than those relating to the FDIC's assertion of a reversionary interest. (*Id.* at 6–7.)

We agree with the United States that the Dernises have failed to timely exhaust claims that are based on any acts or omissions other than the FDIC's assertion of a reversionary interest. The Dernises allege that they exhausted all required administrative remedies when they sent the

January 5, 2021 Letter to the FDIC. (2d Am. Compl. ¶ 7; January 2021 Letter.) For the January 2021 Letter to timely exhaust claims, however, the claims had to accrue on or after January 5, 2019. *See P.W. ex rel. Woodson v. United States*, 990 F.3d 515, 519 (7th Cir. 2021) ("[T]he FTCA's statute of limitations . . . bars any claim against the United States 'unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues.'") (quoting 28 U.S.C. § 2401(b)); *Censke v. United States*, 947 F.3d 488, 489 (7th Cir. 2020). A claim accrues "the first time the plaintiff knew, or a reasonably diligent person in the plaintiff's position, reacting to any suspicious circumstances of which he or she might have been aware, would have discovered that an act or omission attributable to the government could have caused his or her injury." *Woodson*, 990 F.3d at 519–20 (quotation marks omitted) (citing *Arroyo v. United States*, 656 F.3d 663, 669 (7th Cir. 2011)). The January 2021 Letter included assorted complaints about the FDIC's conduct. Some were quite vague, for instance, a reference to the FDIC's "course of dealing"; such allegations were insufficient to put a "legally sophisticated reader" on notice of a connection between the alleged injury and the *specific conduct* asserted as a basis for the claim, as is required to exhaust administrative remedies. *See LeGrande v. United States*, 687 F.3d 800, 813 (7th Cir. 2012). And the only particular act or omission alleged in the January 2021 Letter that fell within the preceding two-year window was the FDIC's assertion of a reversionary interest in 2020.

The Dernises do not meaningfully argue otherwise. Rather, in response to the United States' argument, they state that "this case is about the fact that the FDIC knowingly sold forged mortgage and loan documents to Amos Financial and then failed to enforce its rights under the

Loan Sale Agreement, which efforts have continued through the present." (Pls.' Resp. at 10.)[5] The Dernises do not cite authority or attempt to develop any argument as to the accrual of claims based on this specific conduct or for the proposition that they exhausted their administrative remedies in this regard. We thus hold that to the extent that the Dernises' FTCA claims are premised on actions or omissions other than the FDIC's assertion of a reversionary interest in 2020, they are barred by the FTCA's two-year statute of limitations as not timely exhausted. *See Woodson*, 990 F.3d at 519–22.

### 2. Mootness

The United States maintains that since the only properly exhausted basis for the Dernises' claims is the FDIC's alleged assertion of a reversionary interest, this case is moot given that the FDIC "no longer asserts any interest in" the Michigan Properties due to the Michigan Court of Appeals' ruling that "the assignment of the Dernises' loans from the FDIC Receiver to Amos Financial was, in fact, valid." (Def.'s Mem. Supp. Mot. Dismiss at 7.) "The mootness doctrine implements Article III's Case or Controversy requirement by preventing federal courts from resolving questions that cannot affect the rights of the parties before them." *Ruggles v. Ruggles*, 49 F.4th 1097, 1099 (7th Cir. 2022). "A matter is moot if it becomes impossible for a federal court to provide any effectual relief to the plaintiff." *Id.* (internal punctuation and citation omitted). A district court does not have subject-matter jurisdiction over a claim that is moot. *Gill v. Linnabary*,

---

[5] The Dernises' argument concerning the "reversionary interest" appears to shift. In their latest pleading, they complain about the FDIC Receiver's assertion of the interest in the first place, (2d Am. Compl. ¶¶ 221, 223, 229), alleging that it furthered Premier's fraud, (*id.* ¶¶ 249, 252). In their response brief, the Dernises assert that the FDIC is liable for damages because it *failed* to "act on its reversionary interest," thus allowing Amos Financial to "g[et] away with" the fraud, (Pls.' Resp. at 11), yet then refer to the FDIC's "claim of reversionary interest" as "false," (*id.* at 15–16).

63 F.4th 609, 613 (7th Cir. 2023).

In the United States' view, this case is moot in light of the FDIC's abandonment of any reversionary interest in the Michigan Properties and the Dernises' "fail[ure] to allege that they suffered any damages as a result" of the FDIC's previous assertion of the interest. (Def.'s Mem. Supp. Mot. Dismiss at 7.) We disagree that the Dernises fail to allege that they suffered damages as a result of the FDIC's assertion of a reversionary interest. They allege that the FDIC's conduct caused them harm, economic and otherwise, that could be remedied by the payment of damages. (*E.g.,* 2d Am. Compl. ¶¶ 231, 274, 286, 290, 300, 307.) Whether they would be able to prove damages as a result of the FDIC's assertion of a reversionary interest is another matter, but the allegations are sufficient to establish a case or controversy. *See generally G & S Holdings LLC v. Cont'l Cas. Co.*, 697 F.3d 534, 540 (7th Cir. 2012) (plaintiffs' allegations that they suffered economic harm as a result of defendant's conduct and that the injury could be redressed by the payment of damages were sufficient to meet the "minimal standard" to establish a case or controversy).

## B.    The Tort Immunity Act

Next, we address the United States' contention that Illinois's Tort Immunity Act warrants dismissal. (Def.'s Mem. Supp. Mot. Dismiss at 8–9.) Under the Tort Immunity Act, a "local public entity" can be held liable for an employee's conduct only if the conduct is "willful and wanton." 745 ILCS 10/2-109, 2-202; *Gordon v. Degelmann*, 29 F.3d 295, 299 (7th Cir. 1994).

As stated above, FTCA claims are governed by the substantive law of the state where the alleged tort occurred. *Kaniff v. United States*, 351 F.3d 780, 790 (7th Cir. 2003); 28 U.S.C. §

1346(b)(1) (adopting "the law of the place where the act or omission occurred").[6]  The Seventh Circuit has expressly declined to reach the question of whether the United States can invoke the Tort Immunity Act in an FTCA suit.  *Kaniff*, 351 F.3d at 790 ("This case is not the right one in which to assess whether the policy decision of the State of Illinois to exempt from liability certain torts of its agents should apply in an FTCA case."); *see also Fowler v. United States*, No. 08 C 2785, 2014 WL 683751, at *8 (N.D. Ill. Feb. 21, 2014) (observing that the issue is still open in view of *Kaniff* and, "[d]espite the statutory language rendering government liability in FTCA coextensive with that of a 'private individual,' 28 U.S.C. § 2674, the common practice in this circuit seems to be for courts to apply the Tort Immunity Act to the United States in FTCA actions because it is a public entity, albeit not a 'local' one").

Even if the Tort Immunity Act applied in this case, it would not justify dismissal.  Immunity under the statute is an affirmative defense.  *Tyson*, 539 F. Supp. 3d at 928.  The United States does not assert that the Dernises have pleaded themselves out of court by setting forth everything necessary to satisfy this affirmative defense, nor does it develop its argument by explaining how the allegations of the complaint fail to plausibly suggest willful and wanton conduct.  Its bare assertion that "there is no way to construe the Dernises' allegations as satisfying the willful and wanton standard," (Def.'s Mem. Supp. Mot. Dismiss at 9), does not demonstrate that dismissal is warranted.

---

[6]      Both the Dernises and the United States cite Illinois law without expressly addressing choice of law, so we apply the substantive law of Illinois.  *See Harter v. Iowa Grain Co.*, 220 F.3d 544, 559 n.13 (7th Cir. 2000) (a court need not perform an independent choice-of-law analysis where the parties agree on the governing law and the choice bears a "reasonable relation" to their dispute).

## C.     Immunity Under 28 U.S.C. § 2680(h)

The United States next contends that all of the Dernises' claims "arise out of actions for which the United States is immune from suit" under 28 U.S.C. § 2680(h). (*Id.*)  Section 2680 lists several exceptions to the FTCA's waiver of sovereign immunity for torts.  28 U.S.C. § 2680; *Parrott v. United States*, 536 F.3d 629, 634 (7th Cir. 2008).  Like the requirement of exhaustion, the § 2680 exceptions are not jurisdictional.  With respect to this defense, the Seventh Circuit has instructed: "[T]he proper inquiry is not one of jurisdiction, but whether the United States has a defense to suit.  In conducting this analysis, lower courts should scrutinize the cause of action, and if a § 2680 exception applies, then courts should relieve the United States from the burden of defending against a lawsuit."  *Williams v. Fleming*, 597 F.3d 820, 824 (7th Cir. 2010), *abrogated on other grounds by Simmons v. Himmelreich*, 578 U.S. 621 (2016).  Subsection 2680(h) precludes an FTCA claim "arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights."  28 U.S.C. § 2680(h); *Levin*, 568 U.S. at 507 n.1.

The Dernises' claims are for conversion; invasion of privacy and intrusion upon seclusion; intentional infliction of emotional distress; negligence and negligent infliction of emotional distress; and conspiracy.  None of these claims, as labeled, appear in § 2680(h)'s list of excluded claims.  *See also Levin*, 568 U.S. at 507 n.1 (noting that the statute does not remove conversion from the FTCA's waiver); *Semmerling v. Bormann*, No. 18 C 6640, 2019 WL 10375623, at *3 (N.D. Ill. Sept. 11, 2019) (noting that the statute does not remove intentional infliction of emotional distress or negligence from the FTCA's waiver).  That observation, however, does not end our inquiry.  The United States argues that the Dernises' claims are "creatively captioned" and, in fact,

"arise out of alleged abuse of process, misrepresentation, defamation, or interference with contract rights." (Def.'s Mem. Supp. Mot. Dismiss at 9.)

The mere label a plaintiff chooses for his claim does not govern whether one of § 2680(h)'s exceptions applies. *See, e.g.*, *Preston v. United States*, 596 F.2d 232, 237–38 (7th Cir. 1979) ("It is not unusual for . . . plaintiffs to describe their cause of action in a way calculated to avoid the misrepresentation exception, but the courts have consistently looked behind the plaintiff's characterization."); *Schneider v. United States*, 936 F.2d 956, 959–63 (7th Cir. 1991) (holding that the conduct alleged to have caused plaintiffs' damages, not plaintiffs' characterization of their claim, determined whether their claims fell within the § 2680(h) exception for misrepresentation); *Nixon v. United States*, 916 F. Supp. 2d 855, 859 (N.D. Ill. 2013) ("The court must 'look to the essential act that spawned the damages,' not to 'the manner in which a plaintiff chooses to plead her claim,' in order to determine whether the misrepresentation exception to the FTCA's waiver of sovereign immunity bars the claim.") (quoting *Metro. Life Ins. Co. v. Atkins*, 225 F.3d 510, 512 (5th Cir. 2000)). We must look beyond the language the plaintiff uses to ascertain the real cause of the complaint. *See United States v. Neustadt*, 366 U.S. 696, 703 (1961); *Kugel v. United States*, 947 F.2d 1504, 1507 (D.C. Cir. 1991) (in assessing the nature of a claim for purposes of § 2680(h), a court "must scrutinize the alleged cause" of plaintiff's injury).

The Dernises do not present an analysis of the nature of the torts they allege or any argument that their claims do not fall within the exceptions listed in § 2680(h). Instead, they respond with an unsupported contention that § 2680(h) does not apply due to the Federal Deposit Insurance Act, which provides that the FDIC can "sue and be sued," 12 U.S.C. § 1819(a). This argument misses the mark. The FDIC is no longer a defendant in this action; as we explained in our previous opinion dismissing the First Amended Complaint (Sept. 2022 Op. at 8), the Dernises'

tort claims must be brought under the FTCA, which requires them to name the United States, not the FDIC, as the defendant (which they have now done).  Moreover, as we previously observed, the FTCA contains an express limitation on the sue-and-be-sued clause upon which the Dernises attempt to rely.  (*Id.* at 9 (citing 28 U.S.C. § 2679(a) ("The authority of any federal agency to sue and be sued in its own name shall not be construed to authorize suits against such federal agency on claims which are cognizable under section 1346(b) of this title, and the remedies provided by this title in such cases shall be exclusive."))); *see also Meyer*, 510 U.S. at 476 ("[I]f a suit is cognizable under § 1346(b) of the FTCA, the FTCA remedy is exclusive and the federal agency cannot be sued in its own name, despite the existence of a sue-and-be-sued clause.") (internal punctuation omitted).  So the Dernises cannot avoid the exceptions set forth in § 2680(h).

Having rejected the argument that § 2680(h) is inapplicable, we conclude that all of the Dernises' claims arise out of conduct that is excluded from the FTCA's waiver of sovereign immunity.[7]  Although Count 1 is labeled as a conversion claim, it is fundamentally grounded on deceit or misrepresentation.[8]  The Dernises assert in Count 1 that "[p]ursuant to the *deceptive actions* described herein, Defendant received money and other property otherwise owned by Plaintiffs, including money and real property" and that the United States has "obtained from Plaintiffs money, property, and other valuable things under false pretense and with the intent to

---

[7]     Because the Dernises do not present an analysis of the nature of the torts they allege or any argument that their claims do not fall within the exceptions listed in § 2680(h), they waive the issue.  *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466–67 (7th Cir. 2010).

[8]     "Deceit is intentional manipulation through lies or material omissions when there is a duty to speak; misrepresentation covers negligent misstatements."  *Paul v. United States*, 929 F.2d 1202, 1204 (7th Cir. 1991).  We must "distinguish those causes of action for independent torts that only collaterally involve misrepresentations from those . . . which are fundamentally grounded on the common law tort of misrepresentation."  *Preston*, 596 F.2d at 238.

defraud Plaintiffs." (2d Am. Compl. ¶¶ 271, 244 (emphasis added).) The Dernises also allege that their injuries were caused by the FDIC's having "knowingly sold forged loan documents" and permitted a "fraudulent" foreclosure "to divert and collect millions of dollars and value from Plaintiffs"; "attempt[ing] to enforce documents [it] knew to be fraudulent"; "enabl[ing]" and "continu[ing]" fraud, including by making "false claim[s]" in litigation and "committing a fraud in [sic] the court"; "conspir[ing] to earn a profit through a process of fraud and misrepresentation of material facts"; and engaging in a "scheme to defraud" by knowingly "enforcing fraudulent loans," "attempt[ing] to collect on those fraudulent loans by fraud and deception," selling those fraudulent loans, and attempting to claim a reversionary interest. (*Id.* ¶¶ 17, 19–20, 164, 168, 186, 202, 239–46, 249, 251–52.) Because the Dernises' conversion claim clearly arises from deceit and misrepresentation, § 2680(h) bars it. *See Omegbu v. United States*, 475 F. App'x 628, 629 (7th Cir. 2012) (holding that plaintiff's claim was "precisely the kind barred by the FTCA's exception for misrepresentation and deceit" because it rested on allegations that federal officials deliberately falsified information in his immigration file); *Deloria v. Veterans Admin.*, 927 F.2d 1009, 1012 (7th Cir. 1991) (holding that § 2680(h) barred plaintiff's claim that VA officials conspired to distort his medical records and misrepresent the law, and explaining that plaintiff could not "sidestep the statutory limits of the FTCA by artfully couching his complaint in different jargon"); *Benhase Holdings, LLC v. Tanners Creek Props., LLC*, No. 4:07-cv-0045-DFH-WGH, 2008 WL 54908, at *3 (S.D. Ind. Jan. 2, 2008) (dismissing cross-claim for conversion as barred by § 2680(h) because it arose out of misrepresentation, deceit, or interference with contract rights).

The Dernises' remaining claims—invasion of privacy and intrusion upon seclusion (Count 2), intentional infliction of emotional distress (Count 3), negligence and negligent infliction of emotional distress (Count 4); and conspiracy (Count 5) —are also premised on misrepresentation

and deceit. They arise out of the FDIC's alleged "publication of [] misleading and defamatory information [that] constituted a public disclosure of false allegations" about the Dernises and the "publication" of claims of "reversionary interests," which is alleged to have been "false" and "misleading." (2d Am. Compl. ¶¶ 281–83; 288–90; 292, 296, 298, 305.) Therefore, these claims are likewise barred. *See Beaulieu v. Ashford Univ.*, 529 F. Supp. 3d 834, 849 (N.D. Ill. 2021) (dismissing as barred by § 2680(h) conspiracy claims that sounded in misrepresentation and deceit), *aff'd sub nom. Beaulieu v. Ashford Univ., LLC,* No. 22-1654, 2022 WL 17076691 (7th Cir. Nov. 18, 2022); *Cannon v. Forest Pres. Dist. of Cook Cnty.*, No. 14 C 5611, 2015 WL 921037, at *5 (N.D. Ill. Feb. 26, 2015) (dismissing conspiracy claim against the United States that arose out of fraud and observing that plaintiffs "cannot pursue any claim against the United States that arises out of allegations of deceit or misrepresentation, regardless of how that claim is framed"); *Kimbrell v. Fed. Hous. Fin. Agency*, No. 16-CV-1182, 2016 WL 3746419, at *5 (C.D. Ill. July 8, 2016) (dismissing intentional infliction of emotional distress and slander of title claims that arose from fraud as foreclosed by the FTCA), *aff'd,* 682 F. App'x 486 (7th Cir. 2017) (*Kimbrell II*) ("Kimbrell accuses federal officials of knowingly using falsified mortgage documents to defraud her out of her property. Her claims arise from this alleged fraud and, therefore, fall within the statute's exclusion."); *see also Atkins*, 225 F.3d at 512 (the exception under § 2680(h) for claims arising from misrepresentation "applies to both negligent and intentional misrepresentations"); *Krejci v. U.S. Army Material Dev. Readiness Command*, 733 F.2d 1278, 1282 (7th Cir. 1984) ("[N]egligent misrepresentation is no more actionable under the Tort Claims Act than deceit, or deliberate misrepresentation, itself.").

24

Counts 2 through 5 are also barred by § 2680(h)'s exceptions for libel and slander because the Dernises allege that the FDIC's misrepresentations[9] were "defamatory" and "embarrass[ing]" and publicly portrayed them in a "false and misleading light," (2d Am. Compl. ¶¶ 281–83, 296, 305).  *See Apampa v. Layng*, 157 F.3d 1103, 1104 (7th Cir. 1998) (the FTCA "bars suits for defamation"); *Winters v. Taylor*, No. 08-cv-216-JPG, 2008 WL 11438049, at *3 (S.D. Ill. July 8, 2008) (dismissing negligent infliction of emotional distress claim as barred by § 2680(h)'s slander exception because the claim was based on defendant's statement impugning plaintiff's integrity, and noting that the exception "applies no matter what theory the plaintiff uses so long as the claim 'arises out of' slander or libel"), *aff'd*, 333 F. App'x 113 (7th Cir. 2009).

Because all of the Dernises' claims arise out of tortious conduct that is exempted from redress under the FTCA, they are dismissed with prejudice for failure to state a claim under Rule 12(b)(6).[10]  *See Bourke v. United States*, 25 F.4th 486, 490 (7th Cir. 2022) (the FTCA's waiver of sovereign immunity merges with the claim's substance) (citing *Brownback v. King*, 141 S. Ct. 740, 749 (2021)); *Omegbu*, 475 F. App'x at 629 (dismissal of claim as barred by § 2680(h) should have been on the merits; the exception for the listed torts is a "mandatory rule of decision"); *Smith v. United States*, No. 15-CV-33-NJR-PMF, 2016 WL 3165533, at *4 & n.3 (S.D. Ill. June 7, 2016), *aff'd*, 678 F. App'x 403 (7th Cir. 2017); *Cannon*, 2015 WL 921037, at *3.

---

[9]      The Dernises emphasize in their response brief that the FDIC's assertion of a reversionary interest "was done specifically in pleadings to the courts."  (Pls.' Resp. at 15.)  To that extent, claims based on this conduct are barred by § 2680(h)'s exception for abuse of process.

[10]      As we have explained, the Dernises amended their complaint once in response to the United States' original motion to dismiss and again after we granted the United States' motion to dismiss the amended complaint.  They do not seek leave to amend at this point, and the opportunity need not be given when the plaintiff does not ask for it.  *See Kimbrell II*, 682 F. App'x at 489.  It appears that amendment would be futile in any event given the conduct of which the Dernises complain and the relevant provisions of the FTCA.

25

**D.      Failure to State a Claim**

Were we to hold that the Dernises' claims arise out of conduct that is not barred by the waiver exceptions of § 2680(h), they would nonetheless fail as improperly pleaded under Rule 12(b)(6).  We will briefly address the problems with each claim.

**1.      Conversion**

The Dernises claim in Count 1 that the FDIC "wrongfully converted" their property.  (2d Am. Compl. ¶ 274.)  To state a claim for conversion under Illinois law, a plaintiff must allege that the defendant "wrongfully and without authorization assumed control, dominion, or ownership over" the plaintiff's property.  *Stevens v. Interactive Fin. Advisors, Inc.*, 830 F.3d 735, 738 (7th Cir. 2016) (applying Illinois law); *see also Fortech, L..L.C. v. R.W. Dunteman Co.*, 366 Ill. App. 3d 804, 809 (1st Dist. 2006) ("Conversion is an unauthorized assumption of the right to possession or ownership of personal property.").  The United States argues that the Dernises fail to plead this element because they allege that the FDIC merely asserted a reversionary interest in the Michigan Properties as collateral, and only after the Michigan state court voided Amos Financial's interest in those Properties and transferred interest back to the FDIC Receiver.  (Def.'s Mem. Supp. Mot. Dismiss at 11.)  In response, the Dernises contend without elaboration that the FDIC "assumed control and ownership over" their properties "when it marshalled forged assets and sold them for a profit," (Pls.' Resp. at 14), but that conclusion does not follow.  It is not evident, and the Dernises do not attempt to explain, how the FDIC's mere assertion of a reversionary interest as a result of a state court order would constitute the assumption of control or ownership over their property.  Therefore, the Dernises fail to plausibly allege one of the elements of conversion—that the defendant assumed control, dominion, or ownership over their property without authorization.

### 2. Invasion of Privacy/Intrusion Upon Seclusion

The Dernises assert in Count 2 that the FDIC's "publication" of a claim to a reversionary interest "constituted publicity which place[d] Plaintiffs in a false light in the public eye" as well as "an invasion into Plaintiffs' private matters." (2d Am. Compl. ¶¶ 282–83.) They label this claim as one for "intrusion upon seclusion," but it also appears that they are asserting a claim for publicity tending to put them in a false light. Regardless of whether the Dernises are asserting a claim for intrusion upon seclusion or a false-light claim, Count 2 fails.

Intrusion upon seclusion and publicity placing a person in a false light are two of the four branches of the broader tort of invasion of privacy. *Lawlor v. N. Am. Corp. of Ill.*, 2012 WL 112530, ¶ 33 & n.4. Intrusion upon seclusion requires, among other elements, an intrusion in a plaintiff's *private* affairs or matters. *Id.* at ¶ 33. The government is correct that the Dernises fail to allege this element because they do not allege any private matters or private facts. *See Busse v. Motorola, Inc.*, 351 Ill. App. 3d 67, 71–72 (1st Dist. 2004) ("Without private facts, the other three elements of the tort need not be reached. Because the analysis begins with the predicate, private facts, it also ends there if no private facts are involved."). The Dernises' allegations describing the myriad public legal proceedings, discussions with various individuals and the FDIC, and filings concerning the Michigan Properties contradict their assertion of an intrusion into private matters.

The Dernises' allegations are also insufficient to state a false-light claim, in which a plaintiff must plausibly allege that the defendant's actions placed him in a false light before the public. *See Kolegas v. Heftel Broad. Corp.*, 154 Ill. 2d 1, 18 (1992). As the United States points out, while the Dernises allege that in 2014, *Amos Financial* "published [a] Notice of Mortgage Foreclosure in Michigan regarding the Michigan Lots," (2d Am. Compl. ¶ 198), they do not allege that the *FDIC* published anything about *the Dernises*, let alone information that publicly cast them

in a false light. We are unpersuaded by the Dernises' perfunctory response that the FDIC "permitted Amos Financial to foreclose on Plaintiffs' properties, published false information about them, had interactions with them," (Pls.' Resp. at 15). The FDIC and Amos Financial are separate entities, and the Dernises cite no authority for the proposition that Amos Financial's conduct can be imputed to the United States for tort purposes under the FTCA.

### 3. Intentional and Negligent Infliction of Emotional Distress

Counts 3 and 4 are claims for intentional and negligent infliction of emotional distress. The Dernises allege that the FDIC's conduct of "selling Plaintiffs' loan documents and then publishing misleading information, including claims of reversionary interests," caused them severe emotional distress. (2d Am. Compl. ¶¶ 288–90, 292, 296.) In Illinois, an intentional infliction of emotional distress claim requires a plaintiff to allege that the defendant's conduct was "extreme and outrageous." *Hukic v. Aurora Loan Servs.*, 588 F.3d 420, 438 (7th Cir. 2009) (citing *Kolegas*, 154 Ill. 2d at 20). To meet this standard, the conduct must have been "so extreme as to go beyond all possible bounds of decency, and to be regarded as intolerable in a civilized community." *Id.* We agree with the United States that the FDIC's alleged conduct (even the conduct as to which the Dernises failed to exhaust administrative remedies) falls far short of this demanding standard. In response, the Dernises resort to unconvincing hyperbole, stating that the FDIC "destroy[ed] Plaintiffs' businesses." (Pls.' Resp. at 16.) The demise of the Dernises' businesses may be the alleged *effect* of the FDIC's actions, but the proper focus is on the underlying alleged *conduct*. When viewed through the required objective lens, that conduct cannot plausibly be considered extreme and outrageous. *See Kiebala v. Boris*, No. 16 C 7478, 2017 WL 4339947, at *6 (N.D. Ill. Sept. 29, 2017) (citing Illinois cases concluding that defamatory statements generally do not clear the high hurdle for intentional infliction of emotional distress).

28

The Dernises' claim for negligent infliction of emotional distress is equally unavailing. To state such a claim, a plaintiff must allege the traditional elements of negligence, including that the defendant owed plaintiff a duty. *Pilotto v. Urban Outfitters W., L.L.C.*, 2017 IL App (1st) 160844, ¶ 18. "Duty is defined as a legal obligation to conform one's conduct to a certain standard for the benefit or protection of another." *Id.* (internal punctuation and citation omitted). A tort duty can derive from either the common law or from statute. *Id.* The Dernises broadly allege that the FDIC violated "the general duty to conform to the legal standard of reasonable conduct in light of the apparent risk" of (unspecified) harm and that it had a generalized "duty to exercise reasonable and ordinary care and caution in and about [its] conduct." (2d Am. Compl. ¶¶ 294, 297.) The United States contends that the Dernises have failed to plausibly plead that the FDIC as Receiver owed them a duty associated with the assertion of a reversionary interest. The Dernises insist in response that they have "clearly alleged that Defendant had a duty," (Pls.' Resp. at 16), but they do not elaborate on the nature of that duty or from where it purportedly derives, and we cannot plausibly infer from the facts alleged in the complaint that the FDIC in its capacity as Receiver owed the Dernises any particular duty under tort law with regard to the assertion of a reversionary interest.

### 4.    Conspiracy

In Count 5, the Dernises allege that "Defendants" engaged in "concerted activities" by "express or implied agreement," intending to "strip Plaintiffs of their assets and income and claim of reversionary interest, cast Plaintiffs in [] a false and misleading light, and cause[] Plaintiffs harm and damages." (2d Am. Compl. ¶¶ 304–05.) The United States argues correctly that the Dernises' allegations are insufficient to plead civil conspiracy. "[U]nder Illinois law, a complaint must do more than merely characterize a combination of acts as a conspiracy, and must allege an agreement." *Wilson v. Est. of Burge*, No. 21 C 3487, 2023 WL 2750946, at *55 (N.D. Ill. Mar.

31, 2023) (internal punctuation omitted); *Merrilees v. Merrilees*, 2013 IL App (1st) 121897, ¶ 50 (referring to an agreement as a "necessary and important" element of a conspiracy claim); *Buckner v. Atl. Plant Maint., Inc.*, 182 Ill. 2d 12, 23 (1998). In the Second Amended Complaint, the Dernises refer repeatedly to the allegedly conspiratorial acts of "Defendants," but these allegations are nonsensical; at this juncture of the case there is just a single defendant, the United States. As for an agreement, the Dernises simply allege that "Defendants [sic] engaged in concerted activities described in the preceding paragraphs by express or implied agreement." (2d Am. Compl. ¶ 304.) There is nothing in the Second Amended Complaint from which to reasonably infer the existence of an agreement between the FDIC and anyone.

## CONCLUSION

For the reasons stated above, we grant the United States' Motion to Dismiss the Second Amended Complaint (Dkt. No. 76). The Second Amended Complaint is dismissed with prejudice. Civil case terminated. It is so ordered.

_____
**Marvin E. Aspen**
**United States District Judge**

Dated: July 17, 2023